**RECORD NOS. 16-1270(L); 16-1271**

In The

# United States Court of Appeals

For The Fourth Circuit

## RALEIGH WAKE CITIZENS ASSOCIATION; JANNET B. BARNES; BEVERLEY S. CLARK; WILLIAM B. CLIFFORD; BRIAN FITZSIMMONS; GREG FLYNN; DUSTIN MATTHEW INGALLS; AMY T. LEE; ERWIN PORTMAN; SUSAN PORTMAN; JANE ROGERS; BARBARA VANDENBERGH; JOHN G. VANDENBERGH; AMYGAYLE L. WOMBLE; PERRY WOODS; CALLA WRIGHT; WILLIE J. BETHEL; AJAMU G. DILLAHUNT; ELAINE E. DILLAHUNT; LUCINDA H. MACKETHAN; ANN LONG CAMPBELL; CONCERNED CITIZENS FOR AFRICAN-AMERICAN CHILDREN, d/b/a Coalition of Concerned Citizens for African-American Children,

*Plaintiffs – Appellants*,

v.

## WAKE COUNTY BOARD OF ELECTIONS,

*Defendant – Appellee*,

and

**CHAD BAREFOOT, in his official capacity as Senator and primary sponsor of SB 181; PHILLIP E. BERGER, in his official capacity as President Pro Tempore of the North Carolina Senate; TIM MOORE, in his official capacity as Speaker of the North Carolina House of Representatives; STATE OF NORTH CAROLINA,**

*Defendants.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NORTH CAROLINA AT RALEIGH**

_____

**REPLY BRIEF OF APPELLANTS**

_____

Anita S. Earls
Allison J. Riggs
George E. Eppsteiner
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 West Highway 54, Suite 101
Durham, North Carolina 27707
(919) 794-4198

*Counsel for Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ...............................................................................1

ARGUMENT .....................................................................................4

I.  THE COURT BELOW APPLIED THE WRONG LEGAL STANDARDS TO RWCA'S ONE PERSON, ONE VOTE CLAIMS ..........................................................................4

    A.  An Equal Protection Violation Occurs When Illegitimate Factors Cause Population Deviations .........................................4

    B.  A Rational Basis Analysis is Not the Correct Legal Standard ....................................................................9

    C.  Requiring the Plaintiffs to Assert a "Workable Judicial Standard" for Partisan Fairness Misinterprets the Applicable Legal Standard.........................................16

II.  DR. CHEN'S EVIDENCE IS HIGHLY PROBATIVE OF THE ONE PERSON, ONE VOTE VIOLATION IN THESE PLANS .......18

III.  THE DISTRICT COURT'S FINDINGS OF FACT WERE NOT SUPPORTED BY EVIDENCE IN THE RECORD .................25

IV.  THE BOE'S INTERPRETATION OF STATE CONSTITUTIONAL EQUAL PROTECTION GUARANTEES IS MISTAKEN...............................................................27

V.  RACE PREDOMINATED IN THE DRAWING OF DISTRICT 4 ...............................................................28

CONCLUSION ...................................................................................................30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ala. Leg. Black Caucus v. Alabama*,
135 S. Ct. 1257 (2015)......................................................................7, 28, 30

*Anderson v. Bessemer City*,
470 U.S. 564 (1985).................................................................................27

*Brown v. Nucor Corp.*,
785 F.3d 895 (4th Cir. 2015) ....................................................................24

*Daly v. Hunt*,
93 F.3d 1212 (4th Cir. 1996) ..................................................................6, 7

*Dusch v. Davis*,
387 U.S. 112 (1967)..................................................................................15

*Evenwel v. Abbott*,
136 S. Ct. 1120 (2016)................................................................................2

*Frank v. Forest Cty.*,
336 F.3d 570 (7th Cir. 2003) ....................................................................23

*Harris v. Ariz. Indep. Redist. Comm'n*,
No. 14-232, 2016 U.S. LEXIS 2798 (U.S. Apr. 20, 2016) ...................*passim*

*Hendricks v. Cent. Reserve Life Ins. Co.*,
39 F.3d 507 (4th Cir. 1994) ......................................................................24

*Hunt v. Cromartie*,
526 U.S. 541 (1999)..................................................................................24

*Kidd v. Cox*,
No. 1:06-cv-0997-BBM, 2006 U.S. Dist. LEXIS 29689
(N.D. Ga. May 16, 2006)...........................................................................17

*Larios v. Cox*,
    300 F. Supp. 2d 1320 (N.D. Ga.), *aff'd*,
    542 U.S. 947 (2004)...............................................................*passim*

*Page v. Va. State Bd. of Elections*,
    No. 3:13-cv-678, 2015 U.S. Dist. LEXIS 73514
    (E.D. Va. June 5, 2015) ...................................................................29

*Republican Party of North Carolina v. Hunt*,
    No. 94-2410, 1996 U.S. App. LEXIS 2029 (4th Cir. Feb. 12, 1996) ..........16

*Ridge v. Cessna Aircraft Co.*,
    117 F.3d 126 (4th Cir. 1997) .......................................................25

*Stephenson v. Bartlett*,
    355 N.C. 354, 562 S.E.2d 377 (2002) ...................................27, 28

*United States v. Antone*,
    742 F.3d 151 (4th Cir. 2014) ................................................ 24-25

*United States v. Contreras*,
    2016 U.S. App. LEXIS 7036 (7th Cir. Ill. Apr. 19, 2016)...........................27

*United States v. Hall*,
    664 F.3d 456 (4th Cir. 2012) ......................................................24

*United States v. Wooden*,
    693 F.3d 440 (4th Cir. 2012) ......................................................25

*Veith v. Jubelirer*,
    541 U.S. 267 (2004)...................................................................16

*Whitford v. Nichol*,
    2016 U.S. Dist. LEXIS 47048 (W.D. Wis. Apr. 7, 2016)...........................17

*Wright v. North Carolina*,
    787 F.3d 256 (4th Cir. 2015) ...............................................*passim*

**RULE**

Fed. R. Evid. 201(b) ...................................................................15

**OTHER AUTHORITIES**

Senate Bill 181 ...........................................................................12

Senate Bill 325 .....................................................................11, 12

**INTRODUCTION**

The trial court and Appellee Wake County Board of Elections (hereinafter "BOE") fundamentally disagree with the legal proposition that total population deviations of less than 10% are unconstitutional where they are caused by illegitimate considerations of favoring one set of voters over another, whether defined by region or by political party affiliation. This proposition, advanced in *Cox v. Larios*, 542 U.S. 947 (2004), was squarely affirmed by a unanimous court in *Harris v. Ariz. Indep. Redist. Comm'n*, No. 14-232, 2016 U.S. LEXIS 2798 (U.S. Apr. 20, 2016). While the BOE's issues in this appeal are stated as factual ones, to a large degree what it actually disputes is the law. It is wrong that the clearly erroneous standard applies to every issue in this case.

The parties stipulated that in the two super-district plan, the urban inner District A has 44,177 more people than the suburban outer ring District B. Joint Appendix [J.A.] 165, ¶ 27. The difference between the largest and smallest districts in the seven single-member district plan is 9,162 people. *Id.* This creates substantial dilution of the voting strength and the representation of people in the over-populated districts. Indeed, as the Supreme Court has also just made clear:

> Consistent with constitutional history, this Court's past decisions reinforce the conclusion that States and localities may comply with the one-person, one-vote principle by designing districts with equal total populations. . . . In *Reynolds*, for instance, the Court described 'the fundamental principle of representative government in this country' as 'one of equal representation for equal numbers of people.'

- 1 -

> And the Court has suggested, repeatedly, that districting based on total population serves both the State's interest in preventing vote dilution and its interest in ensuring equality of representation.

*Evenwel v. Abbott*, 136 S. Ct. 1120, 194 L. Ed. 2d 291, 303 (2016) (citations omitted).

The central error made by the court below and by the BOE is the failure to apply the law of the claims that Plaintiffs-Appellants Raleigh Wake Citizens Association, et al., (hereinafter collectively "RWCA") actually asserted and proved at trial. The crucial question for RWCA's one-person, one-vote claim is what caused the population deviations of 9.8% and 7.11% respectively in the super-districts and the seven single-member district plans. *See Harris*, 2016 U.S. LEXIS 2798, at *10; *Wright v. North Carolina*, 787 F.3d 256, 268 (4th Cir. 2015). The trial court's opinion starts with the misstatement that "Plaintiffs contend that the two redistricting plans resulted from the General Assembly's invidious discrimination, arbitrariness, or bad faith." J.A. 516. The BOE similarly throughout its argument asserts that RWCA failed to prove that the plans were the product of bad faith, arbitrariness or invidious discrimination. *See*, *e.g.*, Br. of Appellee 5, 22 & 31.[1] This is wrong because RWCA's claim is not that the redistricting plan as whole is a partisan gerrymander or the product of bad faith, but rather that the only possible explanation for the deviations in the district sizes,

---

[1] Page references to the Brief of Appellee are to the page number at the bottom of the page, not the ECF filing page numbers stamped at the top.

resulting in the dilution of voting strength for voters in the over-populated districts, was the illegitimate desire to advantage the voters of one party over those of another and to advantage rural voters over urban voters.

Indeed, the significance of the alternative maps introduced as an amendment during the legislative process by Representative Rosa Gill and defeated, J.A. 1121-27, are that it was entirely possible to meet all the allegedly rational state goals advanced for the plans—including giving voters the opportunity to elect two school board members, taking away their opportunity to vote for the entire county commission but providing district representation for that body, moving school board elections to even numbered years to increase turnout, reducing voter confusion by using the same districts for both bodies, and reducing campaign and administrative costs—without overpopulating urban districts and underpopulating rural districts.  All of these goals could have been accomplished with a districting plan that divided no precincts, and had an overall deviation of just 0.32% in the seven-single member district plan (413 people) and 0.02% in the two super districts (69 people).  J.A. 795.

The legal question then is whether "it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations' to which we have referred in *Reynolds* and later cases."  *Harris*, 2016 U.S. LEXIS 2798, at *10.

The trial court, misapplying the appropriate legal standard, dismissed the evidence regarding Representative Gill's plan as irrelevant because it "simply shows that 'better' plans can be drawn, but 'better' plans do not equate to unconstitutionality." J.A. 560. Here, the evidence was not simply that a better plan is possible but that no legitimate considerations explained the high deviations in the enacted plans.

By failing to properly apply the law of *Larios* and *Harris*, the court below and BOE misunderstood the uncontroverted evidence presented at trial and came to the wrong conclusion about the constitutionality of the challenged districts. *See Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga.), *aff'd* 542 U.S. 947 (2004); *Harris*, 2016 U.S. LEXIS 2798.

## ARGUMENT

## I. THE COURT BELOW APPLIED THE WRONG LEGAL STANDARDS TO RWCA'S ONE PERSON, ONE VOTE CLAIMS.

### A. An Equal Protection Violation Occurs When Illegitimate Factors Cause Population Deviations.

In *Wright*, this Court held that an equal protection claim is stated where Plaintiffs prove that a "deviation [of nearly 10%] was unjustified, discriminatory, and unconstitutional." *Wright*, 787 F.3d at 265. If the redistricting plans enacted here had near zero overall deviations similar to those in the prior plans used by the Wake County School Board, or similar to those in the Gill alternative maps, Plaintiffs could not assert a one person, one vote violation. The key question is

whether people in the affected districts are experiencing a dilution of their voting strength out of a desire to actually disadvantage them because of where they live or how they vote.

The Supreme Court's unanimous decision in *Harris* unequivocally stated the very same standard for compliance with the fundamental constitutional guarantee of equal representation: "in a case like this one, those attacking a state-approved plan must show that it is more probable than not that a deviation of less than 10% reflects the predominance of illegitimate reapportionment factors rather than the 'legitimate considerations' to which we have referred in *Reynolds* and later cases." *Harris*, 2016 U.S. LEXIS 2798, at *10. That is the legal standard. The Court repeated it again when explaining why the appellants in that case failed to meet the standard: "appellants have not shown that it is more probable than not that illegitimate considerations were the predominant motivation behind the plan's deviations from mathematically equal district populations—deviations that were under 10%." *Id.*, at *16. The Court repeated it a third time in distinguishing *Cox*, where "those attacking the plan had shown that it was more probable than not that the use of illegitimate factors significantly explained deviations from numerical equality among districts." *Id.*, at *18.

Therefore, in this case the controlling legal standard is whether the evidence at trial showed that it was more probable than not that illegitimate considerations

- 5 -

were the predominant motivation behind or significantly explain the plans'
deviations from mathematically equal district populations.

The BOE misstates this standard in two significant ways. First, it leaves out
the crucial component that it is the deviations that must be predominantly caused
by improper considerations, arguing instead generally that for the plans as a whole,
"*Harris* requires Plaintiffs to prove that illegitimate districting factors
predominated over legitimate considerations." Br. of Appellee 13. To the
contrary, Plaintiffs' burden in this case is not to show that the entire redistricting
plan and every element of the statute are all the result of illegitimate
considerations, only that the deviations from one person, one vote are caused by
illegitimate factors.

Second, the BOE is equally wrong to argue that after *Harris*, Plaintiffs must
meet a two-part standard, stating that "[u]nder the standard of proof announced in
*Harris*, Plaintiffs were required to prove not only that the Plans were the result of
illegitimate apportionment factors – i.e., to prove 'bad faith, arbitrariness, or
invidious discrimination' under *Daly* and *Wright* – but also that those factors
predominated over legitimate criteria." Br. of Appellee 22. This is a different
formulation from the standard set out in *Harris.* Plaintiffs need only show that it is
was more probable than not that illegitimate factors were the predominant
motivation behind the plan's deviations. While language in *Daly v. Hunt*, 93 F.3d

1212, 1220 (4th Cir. 1996), more generally required proof that the plan as a whole "has a taint of arbitrariness, or invidious discrimination," and the court below relied on that language, *see*, *e.g.*, J.A. 545, *Harris* surely controls now because it is a subsequent decision of the Supreme Court.[2]  To be clear, Plaintiffs do not argue that *Harris* changed the law or did anything other than restate the constitutional principles followed in *Cox v. Larios* and articulated by this Court in *Wright*.

Finally, while evidence of arbitrariness or discrimination in the plan as a whole may be relevant to determining the factors motivating the plan's population deviations, Plaintiffs' burden here is to prove what explains the population deviations, not what motivated the plan as a whole.  *See Ala. Leg. Black Caucus v. Alabama*, 135 S. Ct. 1257, 1265 (2015) ("*ALBC*") (statewide evidence is relevant to district-based claim but burden remains to show race predominated in a particular district).  While that is a narrow standard to meet, in the extraordinary circumstances of the mid-decade redistricting that occurred in this case, with plans enacted over the strenuous objections of the governing bodies at issue, RWCA's

---

[2] The trial court wrestled with what legal standard to apply in this case, asserting at one point that "[t]he Supreme Court, however, has not expressly articulated how a plaintiff challenging a redistricting plan with a maximum population deviation under 10% proves a prima facie case of invidious discrimination."  J.A. 543.  The Supreme Court has now answered that question.  Plaintiffs challenging a redistricting plan with a maximum population deviation under 10% prevail when they show that more probably than not illegitimate factors significantly explained deviations from numerical equality among districts.  *Harris*, 2016 U.S. LEXIS 2798, at *10, *16, *18.

- 7 -

evidence addressed the precise question of what caused the deviations in the two plans challenged here.

*Harris* confirms that this Court's interpretation of the *Larios* summary affirmance in *Wright* was correct. *Compare Harris*, 2016 U.S. LEXIS 2798, at *18 (a plan with less than 10% deviation may violate equal protection if the deviations are caused by illegitimate factors) *with Wright*, 787 F.3d at 267 (*Larios* is persuasive that a redistricting plan with a maximum deviation in population just under 10% may violate one person, one vote if intended to favor incumbents of one party over another or rural over urban voters). The fact that the plaintiffs in *Harris* were unsuccessful does not mean that the RWCA has failed to prove the necessary elements of this claim.

Unlike in *Harris*, where the court noted that the Arizona Independent Redistricting Commission's plan resulted in a "grid-like map," *Harris*, 2016 U.S. LEXIS 2798, at *11, the districts that are over- and underpopulated in this case are highly non-compact visually, particularly in comparison to districts in prior Wake County plans. *Compare* J.A. 882, 883 (previous plans) *with* J.A. 1051, 1052 (enacted plans). Also unlike in *Harris*, these plans were not subject to review under Section 5 of the Voting Rights Act and thus obtaining preclearance from the Department of Justice was not a consideration that might justify higher than necessary population deviations. These were re-redistricting plans passed mid-

decade after the two entities in question had already adopted new districts following the 2010 census (including residency districts for the Board of County Commissioners) that complied with the one person, one vote requirement. J.A. 158-59, 170-72. This is also an unusual case because the legislators enacting the plan refused to defend it and claimed legislative privilege to avoid providing Plaintiffs with any discovery regarding their motivations. J.A. 107. Significantly, in most cases it will not be true that the partisan outcome of the districts will be very significantly outside the range of any of 500 simulated redistricting plans for the jurisdiction that maintain low deviations, as established by the expert testimony here. *See* J.A. 776, 779.

This Court can apply the *Harris* standard to the record evidence from the trial below to determine that the equal protection clause was violated. The trial court arrived at the wrong answer to that question because it applied the completely wrong legal standard.

B.    A Rational Basis Analysis is Not the Correct Legal Standard.

There is nothing in the *Harris* opinion to suggest that in a case such as this, the trial court should apply rational basis review to the legislative enactment. Indeed, rational basis review involves an analysis that is directly contrary to the question of whether illegitimate factors were the predominant cause of the population deviations among districts. As the trial court noted, under rational basis

review, "'it is constitutionally irrelevant whether this reasoning in fact underlay the legislative decision' … any conceivable legislative purpose is sufficient and 'those attacking the rationality of the legislative classification have the burden to [negate] every conceivable basis which might support it.'" J.A. 552 (citations and quotations omitted). In contrast, in the one person, one vote context, the actual motivation or explanation for the deviations is all that matters. Hypothetical explanations or rational explanations that were not actually considered at the time have no relevance here. Most importantly for this case, Plaintiffs do not have to prove that the illegitimate considerations were the only cause of the population deviations; Plaintiffs simply must prove that more probably than not, illegitimate considerations predominated over other factors.

The trial court applied a rational basis review to the redistricting plans enacted by the General Assembly, believing that it was the best way to analyze this type of claim. J.A. 550-53. The BOE similarly urges this Court to uphold the plans because they "were rationally related to the General Assembly's stated motives," Br. of Appellee 13, and seeks to distinguish *Larios* on the grounds that the plans in this case "were rationally related to legitimate policies stated by the bill sponsors." Br. of Appellee 15. Throughout its argument, the BOE returns to the "rational state policy" justification for these plans. *See*, *e.g.*, Br. of Appellee

- 10 -

23, 27, 39, 44.  Rational basis review is not the correct legal analysis to apply in this case.

Applying the wrong standard leads the trial court and the BOE to accord the wrong significance to the evidence in this case.  The court below gave great weight to the statements of the sponsors of the legislation during the legislative process concerning their stated goals for enacting new redistricting plans.  *See*, *e.g.*, J.A. 553-55 (school board rationales); 567 (county commission rationales).  The court then concluded that since those goals were rational state policies, the plans are constitutional.  J.A. 554, 567, 569.

Plaintiffs presented some evidence that the stated goals were pretextual because they did not hold water factually.  However, even assuming those were the genuine goals of the legislature, they do not prove that the plans satisfy the one person, one vote standard.  If there is some evidence, or even some logical reason to infer, that those considerations led to certain districts being overpopulated, then those statements are relevant to the ultimate question of whether it was more probable than not that illegitimate considerations caused the population deviations. The trial court should have been asking whether those legitimate motivations were actually the reasons for the population deviations.  They were not.

With regard to Senate Bill 325 redrawing districts for the Wake County School Board in 2013, the rationales were:

- 11 -

1. Allowing voters to elect two school board members as opposed to one school board member in order to improve school board representation, J.A. 523, 553-54, and

2. Moving school board elections from odd-numbered years to even-numbered years to increase voter turnout, J.A. 524.

There is no possible way that either of these rationales explain why super District A needs to be 44,117 people larger than Super District B.  Electing two school board members is achieved by the dual-district plan structure.  Moving the school board elections to even-numbered years is completely unrelated to how the county is divided into districts.  Thus, the notion that the legislative record of statements by the proponents of Senate Bill 325 providing rationales for the adoption of new districts for the Wake County Board of Education refutes Plaintiffs' evidence regarding the cause of the population deviations is patently illogical.

The legitimate governmental rationales for Senate Bill 181, eliminating the at-large election system with residency districts for the Wake County Board of County Commissioners adopted in 2015, are more varied but ultimately do not resolve the question of the predominant motivation for population deviations in favor of the defendants.  Those stated rationales as found by the court below were:

1. To use the same districts for the school board and county commission in order to avoid litigation; reduce administrative costs for the BOE; and reduce voter confusion;

2. To reduce the cost of campaigning for candidates;

3. To improve representation of citizens in Wake County by enhancing geographic diversity.  J.A. 567.

The first rationale is in no sense dependent on having districts with nearly 10% overall deviation and cannot explain that deviation.  To truly avoid litigation, the General Assembly could have corrected the deviation problem and used the same constitutionally-compliant districts for the school board and the county commission.  Indeed, the General Assembly virtually ensured litigation by using a plan which they acknowledged was currently being litigated.  J.A. 980 (Statement of Rep. Paul Stam), 1000 (Statement of Amy Womble).  Nevertheless, this goal cannot explain the population deviations.

Similarly, the second goal, even assuming it is not completely contrary to the unrebutted factual record in this case concerning the amount of money that county commission candidates spend in elections, has no bearing on where the district lines are drawn.  It defies logic that the outer ring super District B can reduce campaign costs when it stretches around the entire county, but it is equally illogical that the district needed to be underpopulated in order to save campaign

costs. In short, there is no link between this goal and the over and under-population of districts in these plans.

The third goal of enhancing geographic diversity on the county commission is the most interesting. The trial court reasoned that "the Supreme Court has never held that, in formulating a redistricting plan, a state legislature must ignore communities of interest in urban areas, suburban areas, or rural areas." J.A. 569. That is true. It is equally true that the Supreme Court has summarily affirmed that a one person, one vote violation occurred where "a deliberate and systematic policy of favoring rural and inner-city interests at the expense of suburban areas north, east, and west of Atlanta led to a substantial portion of the 9.98% population deviations in both of the plans." *Larios v. Cox*, 300 F. Supp. 2d 1320, 1327 (N.D. Ga. 2004). Thus, while the legislature can recognize communities of interest, it cannot deliberately give greater weight to the votes of certain voters, based on where they live. *Cox v. Larios*, 542 U.S. 947, 949 (2004) ("The District Court correctly held that the drafters' desire the give an electoral advantage to certain regions of the State and to certain incumbents (but not incumbents as such) did not justify the conceded deviations from the principle of one person, one vote."). The legislature can consider communities of interest but cannot give some communities more representation than others.

To the extent that the court below held that it is legitimate for the school board and county commission plans to take into account communities of interest in drawing districts, that is a correct statement of the law.[3]  J.A.  569.  However, to the extent that the court below acknowledges that this consideration actually explained the population deviations in the districts used in the plans, then Plaintiffs have successfully met their burden in this type of case and are entitled to relief.  On this point, the court below, contrary to this Court's direction in *Wright*, found *Larios* distinguishable.  J.A. 570.  In fact, there is a direct link between the locations of the over and under populated districts and the rural interests that the bill sponsors sought to privilege over urban interests.  *Larios*, and now *Harris*, are directly relevant and controlling.

The BOE cites *Dusch v. Davis*, 387 U.S. 112 (1967), for the proposition that there is no invidious discrimination where recognizing communities of interest causes population deviations, Br. of Appellee 40, but *Dusch* is inapplicable here because it concerned residency districts in an at-large system where there is no dilution of voting strength.  *Dusch*, 387 U.S. at 114.  The districts in these plans do

---

[3] It is worth noting that the trial court's entire discussion of communities of interest in Wake County at J.A. 569-570 is not based on any evidence in the record in this case and likely goes beyond what is properly the subject of judicial notice.  *See* Fed. R. Evid. 201(b) (stating, in relevant part, that a "court may judicially notice a fact that is not subject to reasonable dispute because it" "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

substantially and intentionally dilute the voting strength and representation of people in certain parts of Wake County. Applying the correct legal standard, on the facts as found by the court below, the plans violate the one person, one vote standard.

C.     <u>Requiring the Plaintiffs to Assert a "Workable Judicial Standard" for Partisan Fairness Misinterprets the Applicable Legal Standard.</u>

Unable to let go of the notion that RWCA is bringing a partisan gerrymandering challenge to the redistricting plans at issue here, the trial court and the BOE argue that Plaintiffs have failed to prove their case because there is no "workable standard for evaluating political gerrymandering claims" and "the disconnect between purported partisan *motivations* and actual partisan *outcomes* plagues the judiciary's ability to fashion a test to measure the level of partisanship in a particular redistricting plan." Br. of Appellee 31-32 (emphasis in original). Citing *Veith v. Jubelirer*, 541 U.S. 267 (2004), and *Republican Party of North Carolina v. Hunt*, No. 94-2410, 1996 U.S. App. LEXIS 2029 (4th Cir. Feb. 12, 1996), both of which are partisan gerrymandering cases, the BOE makes the argument that there is a "lack of any judicial standards to evaluate permissible and prohibited forms of partisanship" and therefore the court below properly rejected

Plaintiffs' claims.[4]   Plaintiffs have not pled a political gerrymandering claim. *Wright*, 787 F.3d at 268.

The Plaintiffs do articulate a workable standard to distinguish forms of partisanship that are constitutional from those that are not in the one person, one vote context.  Arguing what the *Harris* court assumed without deciding, *see* 2016 U.S. LEXIS 2798, at *18, Plaintiffs have claimed from the beginning of this litigation that intentionally trying to give greater weight to the votes of certain voters based on their partisan affiliation or voting behavior, whether or not the attempt is successful on election day, is an illegitimate reason for deviating from numerical equality of population.  J.A. 45.  It is intentionally rigging the system to favor one political party.[5]   The fundamental principle of one person, one vote

---

[4] There continues to be litigation over the appropriate standard for proving a partisan gerrymander, which would be relevant were Plaintiffs raising that claim here.  *See Whitford v. Nichol*, 2016 U.S. Dist. LEXIS 47048, *39-40 (W.D. Wis. Apr. 7, 2016) (denying summary judgment in partisan gerrymander case because "a majority of the Supreme Court has directed litigants and lower courts to continue searching for an appropriate standard for deciding partisan gerrymandering claims. In light of that directive, it would be inappropriate to interpret prior case law as rejecting all formulations of the intent requirement for those claims.").

[5] The decision in *Kidd v. Cox*, No. 1:06-cv-0997-BBM, 2006 U.S. Dist. LEXIS 29689 (N.D. Ga. May 16, 2006), a subsequent challenge to certain districts in the new remedial plan adopted after the *Larios v. Cox* summary affirmance, does not hold that partisan factors can justify deviations from the one person, one vote principle, as the BOE asserts.  *See* Br. of Appellee 31 n.6.  The deviations at issue there were under 1% and there was no evidence that partisan considerations created the very small deviation in the three districts that were challenged.  *See Kidd*, No. 1:06-cv-0997-BBM, 2006 U.S. Dist. LEXIS 29689, at *32-34.

means that election structures should create a level playing field for all voters no matter how they vote.

Most importantly, Plaintiffs have offered strong statistical evidence of the cause of the deviations in the plans adopted here. The BOE completely misrepresents the nature of that evidence and the trial court was wrong to dismiss it.

## II.  DR. CHEN'S EVIDENCE IS HIGHLY PROBATIVE OF THE ONE PERSON, ONE VOTE VIOLATION IN THESE PLANS.

Dr. Jowei Chen, a political science professor with expertise in the use of computer algorithms and geographic information systems to study questions related to political and economic geography and redistricting was asked to analyze 1) whether the population deviations in the seven single-member district plans and the two super districts plans were motivated by a partisan purpose and 2) whether race predominated in the drawing of District 4 in the seven single-member district plan. J.A. 767-68. In order to assess the first question, he used computer simulation programming techniques that allow him to generate randomly a large number of alternative redistricting plans. The computer simulations can be programmed to optimize districts with respect to various traditional redistricting goals. His methodology is based on the logical proposition that "by generating a large number of randomly drawn districting plans that closely follow these traditional redistricting criteria, I am able to assess an enacted plan drawn by a

state legislature and determine whether racial and partisan goals may have motivated the legislature to deviate from traditional districting criteria." J.A. 768.

Put simply, if a computer randomly draws five hundred redistricting plans following traditional redistricting criteria and the actual enacted plan falls completely outside the range of any of the plans the computer has drawn, it is statistically valid to conclude that the traditional criteria do not explain that enacted plan. And that is exactly what Dr. Chen found when he ran the computer simulations in this case.

The four traditional redistricting criteria Dr. Chen programmed the computer to follow were:  1) population equality; 2) holding municipalities intact to the extent possible; 3) keeping precincts whole; and 4) geographic compactness.  He provided examples of what the resulting districts looked like compared to the actual enacted districts.  J.A. 773-74.  Most significantly, when he compared the partisanship of each of the districts in his simulation with the partisanship of the enacted districts, the fact that the enacted districts were completely outside the range of simulated districts is clear from this figure illustrating his results:



Figure 3:

Two Super–District Plans:
Comparison of Enacted and Simulated Plan Districts
On Population Deviation and Partisanship (2014 County Commssioner Elections)

J.A. 775.  Had District A and District B in the super district plan fallen within the 40.8% to 48.2% partisanship range, where the 500 simulated plans landed, the 5% deviation could not have been said to be a product of partisan considerations.  In Dr. Chen's words:

> [T]hese large deviations from equal population enable the enacted districting plan to achieve a partisan outcome that is entirely and very significantly outside of the range produced by the 500 simulated plans … These findings confirm and strengthen the original conclusion that the enacted two-district plan's significant deviations from population

equality were motivated as part of an effort to achieve a partisan outcome that would have been statistically impossible under a non-partisan redistricting process adhering to population equality.

J.A. 776.    The BOE's critique of this analysis shows a fundamental misunderstanding of statistics.    Br. of Appellee 9.    This is not a sampling methodology; Dr. Chen is not making an inference "from the part to the whole" as the BOE assumes.    *Id.* (quotations omitted).    When cross examined about the "name" of the statistical test he used in this case, Dr. Chen explained that what he is doing is analyzing distributions, "something that statisticians have been doing for hundreds of years."    J.A. 501.    He was not taking a sample and making inferences about a larger set of possible redistricting plans.    Put simply, his analysis of the distribution of plans drawn according to traditional redistricting criteria shows that the partisanship of the enacted districts does not happen when traditional redistricting criteria are followed.

The BOE also asserts that the traditional redistricting criteria he programmed the computer to use were not criteria that the General Assembly was required by law to follow.    Br. of Appellee 8, 37.    Similarly, the trial court's rationale for rejecting his opinion was that neither North Carolina nor federal law requires redistricting plans to remain below 2% in overall deviation; prohibits dividing precincts; or requires the General Assembly to ignore partisan considerations and therefore, his universe of 500 plans does not "sample

simulations of other possible redistricting plans that could be created but only a limited subset of such redistricting plans." J.A. 557. These critiques miss the point that his analysis is only intended to statistically evaluate the explanation for, or cause of, the deviation in the enacted plan. That is precisely what the legal standard in this case requires Plaintiffs to prove.

Dr. Chen used the four traditional redistricting criteria he identified because they are the kinds of explanations for deviations that the U.S. Supreme Court has previously suggested are legitimate reasons for departing from strict mathematical equality of population. *See Harris*, 2016 U.S. LEXIS 2798, at *8. His point is not that any of the 500 simulated plans are legally required, but rather that they help demonstrate what might explain the deviations in the plan that was actually enacted.[6] Indeed, Dr. Chen testified that "I analyzed a wide range of population thresholds and what I can say is that using any reasonable population threshold I can conclude with statistical certainty that the only way to achieve the partisan outcomes achieved by the districting plans enacted by the legislature is to deviate from population equality." J.A. 483. Instead of "discrediting" Dr. Chen's methodology and demonstrating that he is not credible, these criticisms represent a

---

[6] He also testified that he employed a plus or minus 1% threshold for equal population because that was the deviation in the school board's prior nine district plan. J.A. 478-79.

complete failure to understand the nature of Plaintiffs' claim and the logic of Dr. Chen's statistical approach to evaluating the enacted plans.

The BOE also contends that the court below was justified in rejecting Dr. Chen's analysis because he chose the wrong elections to assess the partisanship of the enacted plan. Br. of Appellee 36-37; J.A. 558, 561. This criticism does not refute his results. To be sure, there is no testimony in the record that if he had used different elections to assess partisanship, he would have encountered different results in demonstrating whether the enacted plans were in fact outliers. Similarly, the theory of the court below that the Superintendent of Public Instruction election would be more probative of actual partisan outcomes in Wake County school board elections is not based on any testimony or any other type of evidence in this case. *See* J.A. 558. The court's reliance on *Frank v. Forest Cty.*, 336 F.3d 570, 575-76 (7th Cir. 2003), here is misplaced. *Frank* is distinguishable because in that case the plaintiffs relied on national polarized voting studies that did not apply to the local electoral districts being challenged. *Frank*, 336 F.3d at 572.

Here, Dr. Chen's assessment of partisanship was based on actual voters in Wake County. There is nothing illogical about his decision to rely on strongly contested presidential contests and partisan elections for the county commission, rather than the less high-profile statewide race for State Superintendent of Public Instruction. *See* J.A. 1037-38 (in the 2008 general election, 437,892 Wake County

voters cast ballots for either the Democratic or Republican candidate in the Presidential race, and only 418,196 voters cast a ballot in the contest for State Superintendent of Public Instruction, a difference of 19,696 voters).

While evaluating the credibility of experts is a function best left to the trial court, both cases relied on by the BOE involve a situation where the trial court heard conflicting expert testimony and faced the difficult task of sorting out which expert was right. *See* Br. of Appellee 18 (citing *Hendricks v. Cent. Reserve Life Ins. Co*., 39 F.3d 507, 513 (4th Cir. 1994) ("An appellate court should be especially reluctant to set aside a finding based on the trial court's evaluation of *conflicting expert testimony*.") (emphasis added)); *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012) (same). Here, there are no dueling experts. And as in *Hunt v. Cromartie*, 526 U.S. 541 (1999), where the trial court misunderstands the expert's testimony, the failure to credit or rely on that testimony is clear error. This Court's opinion in *Brown v. Nucor Corp.*, 785 F.3d 895, 904 (4th Cir. 2015) is particularly relevant on this point. In that case, the trial court rejected Plaintiffs' expert's statistical evidence based on perceived flaws in the data. This Court reversed, explaining that "[t]he critical question is thus not whether the data used is perfect but instead whether it is reliable and probative of discrimination. To that end, a court must examine whether any statistical assumptions made in the analysis are reasonable." *Id.* (citations omitted). *See also United States v. Antone*, 742 F.3d

151, 168-9 (4th Cir. 2014) (rejecting trial court's conclusion regarding which expert's opinion to credit); *United States v. Wooden*, 693 F.3d 440, 457 (4th Cir. 2012) (holding that deference due to district court's credibility determination regarding expert testimony not appropriate where "the district court's analysis of the issue again leave us firmly and definitely convinced that the district court's factual findings were mistaken"). Failing to understand the methodology, and applying the wrong legal standard to the evidence, the trial court's ultimate determination that Dr. Chen's unrebutted testimony was not credible is reversible error.[7]

## III. THE DISTRICT COURT'S FINDINGS OF FACT WERE NOT SUPPORTED BY EVIDENCE IN THE RECORD.

The BOE's contention that it was reasonable for the court below to "discredit" the evidence provided by Anthony Fairfax has no basis in fact. *See* Br. of Appellees 36. The trial court faults Fairfax's analysis of the likely partisan

---

[7] The BOE argues that testimony elicited on cross-examination can rebut witness testimony. Br. of Appellee 19. The case cited for this proposition actually makes clear the distinction between rebuttal testimony and testimony under cross-examination that discredits the direct testimony. *See Ridge v. Cessna Aircraft Co.*, 117 F.3d 126, 130 (4th Cir. 1997) ("The district court did not err in refusing to exclude the evidence as unfairly prejudicial because the evidence was probative on the issue of notice, and Cessna was free to offer evidence to *rebut* plaintiff's evidence or to *discredit* plaintiff's evidence during cross-examination.") (emphasis added) (citations omitted). Plaintiffs are correct that their evidence was unrebutted because there was no counter evidence introduced on this point. Dr. Chen's testimony under cross-examination did not discredit his opinions. J.A. 476-502.

performance of the districts because it is based on 2004 and 2008 presidential election returns for Wake County.  *See* J.A. 561, 805 (Fairfax expert report) and J.A. 561.  As with the court's rejection of Chen's analysis, there is no evidence that using any other election returns would have produced a different conclusion.  The rest of the trial court's criticisms of Fairfax's analysis are internally consistent or fault him for failing to include plainly irrelevant information.  Voter registration data is a much less reliable indicator of partisan performance in part because, as the trial court notes, so many voters are registered as independents and voters do not always vote consistent with their partisan affiliation in general elections.  So it was logical that Fairfax did not rely on that data in assessing partisan performance.

With regard to how the plans treated incumbents, the court faults Fairfax for not taking into account election outcomes and candidate choices that occurred after the plans were enacted, and criticizes him for not examining incumbent pairings in the 2011 Board of Education redistricting plan.  J.A. 560.  Those are both irrelevant to whether the enacted plan treats incumbents equally or, when they were enacted, were likely to favor one party over another.

Even more egregious is the trial court's finding that every one of the Plaintiffs' witnesses, whether legislator, local elected official or a lay witness, was not credible, without any explanation based on the evidentiary record of why that particular testimony is not credible.  It is well established that a trial judge may not

"insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness." *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); *see also United States v. Contreras*, 2016 U.S. App. LEXIS 7036, *15 (7th Cir. Ill. Apr. 19, 2016) ("[S]imply affixing the label 'credibility determination' will not insulate a decision from review, and the court must base a finding on evidence, not mere speculation."). Yet that is precisely what occurred here. The trial court's determinations of witness bias, unreliability, "opinion" testimony that was based on the lay witness' personal experiences and wholesale disregard of any and all testimony because the witness opposed the legislation at issue are all conclusory findings unsupported by evidence in the record.

## IV. THE BOE'S INTERPRETATION OF STATE CONSTITUTIONAL EQUAL PROTECTION GUARANTEES IS MISTAKEN.

The BOE misinterprets *Stephenson v. Bartlett*, 355 N.C. 354, 562 S.E.2d 377 (2002), as providing a safe harbor for all redistricting plans with maximum population deviations within 5% of the ideal population, stating that the 5% maximum permitted under state law exists "to *assure* such districts would be in compliance with the federal one person, one vote standard." Br. of Appellee 44 (emphasis added). Although certainly a stricter limit on maximum population deviations than that required under federal law, the North Carolina Supreme Court's 5% limit provides no such safe harbor.

The North Carolina Supreme Court has unequivocally stated that "an application [of state law] that abrogates the equal right to vote, a *fundamental* right under the State Constitution, must be avoided in order to uphold the principles of substantially equal voting power and substantially equal legislative representation arising from that same Constitution." *Stephenson*, 355 N.C. at 382, 562 S.E.2d at 396 (emphasis in original). The BOE acknowledges that redistricting cases arising under North Carolina law have been subject to a higher standard of review than that required under federal law, Br. of Appellee 45, yet would conclude that the redistricting plans at issue here are somehow sheltered from the more searching review required under North Carolina law because they fall within the plus or minus 5% limit and thus automatically satisfy one person, one vote. Such a conclusion plainly contradicts North Carolina law, and both the BOE and the district court have misinterpreted and misapplied the equal protection guarantees that entitle Plaintiffs to relief under the North Carolina Constitution.

## V.    RACE PREDOMINATED IN THE DRAWING OF DISTRICT 4.

RWCA has provided ample unrebutted evidence that, when the correct legal standard on racial predominance is applied, RWCA is entitled to a finding that race predominated in the construction of District 4. Jurisdiction-wide evidence of racial predominance, while not alone sufficient, is relevant. *ALBC*, 135 S. Ct. at 1265. That is why Rep. Stam's repeated references to the need to move to single member

districts to avoid vote dilution are significant.  J.A. 733, 735, 980, 1002.  But RWCA presented substantial district-specific evidence as well.

All of Dr. Chen's evidence on racial predominance is specific to District 4, J.A. 450, 468-69—he and RWCA made no efforts to prove race predominated across the entire plan.  Contrary to the BOE's assertions, the shape, demographics and the way that precincts were split in District 4 are all proper evidence of whether race predominated.  *Page v. Va. State Bd. of Elections*, No. 3:13-cv-678, 2015 U.S. Dist. LEXIS 73514, at *20-21 (E.D. Va. June 5, 2015).  For example, Jannet Barnes did not need to testify to the inner workings of the legislative mapdrawer's mind.  She testified that the split in her precinct, where she has lived and been politically active for decades, was on the basis of race because it cleaved the white portion of the precinct off from the black portion of the precinct, and the black portion of the precinct is what was pulled into the district.  J.A. 506-14.

Finally, as discussed more fully in RWCA's opening brief, the argument that because District 4 was not "newly drawn" in 2015, and was copied from 2013, that somehow bars RWCA from relief from a racial gerrymander is plainly illogical, especially in light of the fact that BOE put on no evidence of compelling governmental interest or narrow tailoring.  If race predominated in the line placement in District 4, regardless of when it was drawn, RWCA has met its

threshold burden and with no evidence that the district survives strict scrutiny, the district is unconstitutional. *ALBC*, 135 S. Ct. at 1263.

## CONCLUSION

For the foregoing reasons, RWCA respectfully requests that the Court reverse the decision of the court below and remand with instructions to enter judgment in favor of Plaintiffs enjoining the BOE from implementing the district plans enacted by the North Carolina General Assembly for the Wake County Board of Elections and Wake County Board of County Commissioners.

This the 29th day of April, 2016.

Respectfully submitted,

/s/ Anita S. Earls
N.C. State Bar No. 15597
Allison J. Riggs
N.C. State Bar No. 40028
George E. Eppsteiner
N.C. State Bar. No. 42812
SOUTHERN COALITION FOR SOCIAL JUSTICE
1415 West N.C. Highway 54, Suite 101
Durham, North Carolina  27707
919-794-4198

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*6,987*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2007*] in [*14pt Times New Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].


Dated: April 29, 2016                    /s/ Anita S. Earls
                                         *Counsel for Appellants*

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this 29th day of April, 2016, I caused this Reply Brief of Appellants to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

| | |
|---|---|
| Charles F. Marshall, III | Matthew B. Tynan |
| Jessica Thaller-Moran | BROOKS, PIERCE, MCLENDON, |
| BROOKS, PIERCE, MCLENDON, |   HUMPHREY & LEONARD, LLP |
|   HUMPHREY & LEONARD | 2000 Renaissance Plaza |
| 150 Fayetteville Street | 230 North Elm Street |
| Raleigh, North Carolina  27602 | Greensboro, North Carolina  27420 |
| (919) 573-6227 | (336) 271-3171 |
| | |
| *Counsel for Appellee* | *Counsel for Appellee* |

I further certify that on the 2nd day of May, 2016, I caused the required copies of the Reply Brief of Appellants to be hand filed with the Clerk of the Court.

/s/ Anita S. Earls
*Counsel for Appellants*